## ORAL ARGUMENT NOT YET SCHEDULED

Nos. 23-1025, 23-1030

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

TROUTBROOK COMPANY LLC,
d/b/a BROOKLYN 181 HOSPITALITY LLC

*Petitioner,*

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent.*

---

On Petition for Review from the National Labor Relations Board
Case No. 29-CA-275229
The Honorable McFerran, Prouty, and Ring

---

## Petitioner's Opening Brief

---

RAYMOND J. PASCUCCI
THOMAS G. ERON
BOND, SCHOENECK & KING, PLLC
600 Third Avenue
New York, New York 10016
Telephone: (646) 253-2300
rpascucci@bsk.com
teron@bsk.com
*Counsel for Petitioner*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.     Parties

As part of the proceeding before the NLRB, the following parties appeared:

(a) Troutbrook Company LLC, d/b/a Brooklyn 181 Hospitality LLC

("Troutbrook" or the "Hotel")

(b) New York Hotel and Motel Trades Council, AFL-CIO

(c) National Labor Relations Board – Region 29

In the case now before the Court, there are currently two parties.

**(a) Petitioner**

Troutbrook Company LLC, d/b/a Brooklyn 181 Hospitality LLC

**(b) Respondent**

National Labor Relations Board, Appellate Office
Ruth Burdick
Milakshmi Rajapakse
David Seid
1015 Half Street, SE
Washington, DC 20570

### B.     Rulings Under Review

There is one ruling under review.  That ruling is the Board's December 16, 2022 decision in Case No. 29-CA-275229 (reported at 372 NLRB No. 26), finding that Troutbrook unlawfully refused to bargain with the New York Hotel and Motel Trades Council, AFL-CIO (the "Union"), and granting the Union's request for a

twelve (12) month extension of its certification year from the date that Troutbrook began bargaining in good faith with the Union.

### C.  Related Cases

This case has not been previously before this or any other court.  Counsel notes three prior rulings which are related to this case.  The first is the Board's June 3, 2019 decision in Case No. 29-CA-232891 (reported at 367 NLRB No. 139), finding that Troutbrook unlawfully refused to bargain with the Union.  The second is the Board's underlying December 13, 2018 decision in representation Case No. 29-RC-216327 (reported at 367 NLRB No. 56), denying the Employer's Request for Review of the Regional Director's Decision and Order, and resulting in the certification of the Union as the bargaining representative of certain Troutbrook employees.  This Court enforced both Board decisions.  *See Troutbrook Co. LLC v. Nat'l Lab. Rels. Bd.*, 801 F. App'x 781, 782 (D.C. Cir. 2020).

The third ruling was related to a 10(j) Petition for Preliminary Injunction filed in the Eastern District of New York by Kathy Drew King, Regional Director of Region 29 of the National Labor Relations Board, seeking a preliminary injunction ordering Troutbrook to bargain in good faith with the Union until a final disposition was reached in Case No. 29-CA-275229.  Judge DeArcy Hall denied the requested injunction.  *See King v. Troutbrook Co., LLC*, 1:21-CV-04715 (E.D.N.Y. Apr. 20, 2022) (Dkt. #30).  Thereafter, the parties to that case entered into a stipulation of

discontinuance, and no preliminary injunction was ordered.  *See King v. Troutbrook Co., LLC*, 1:21-CV-04715 (E.D.N.Y. Apr. 26, 2022) (Dkt. #31).

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Petitioner Troutbrook Company, LLC d/b/a Brooklyn 181 Hospitality, LLC ("Troutbrook") hereby states that it is a limited liability company engaged in the business of hotel management.  Troutbrook has no parent company and no publicly traded companies own 10% or more of Troutbrook's membership interest. Troutbrook was formed in the State of New York and is qualified to do business where it operates hotels.

## <u>TABLE OF CONTENTS</u>

**Page**

JURISDICTIONAL STATEMENT ...................................................................1

STATEMENT OF ISSUES ...............................................................................1

STATUTES AND REGULATIONS...................................................................1

STATEMENT OF THE CASE............................................................................2

    A.    Troutbrook's Business and Operations ................................2

    B.    First Bargaining Session................................................................2

    C.    Second Bargaining Session ...........................................................4

    D.    Third Bargaining Session ...............................................................8

    E.    Fourth Bargaining Session .............................................................10

    F.    Fifth Bargaining Session ..............................................................15

    G.    Sixth Bargaining Session .............................................................18

    H.    NLRB Proceedings .......................................................................19

SUMMARY OF ARGUMENT .........................................................................21

STANDING .....................................................................................................23

ARGUMENT ...................................................................................................23

    A.    Standard of Review. .....................................................................23

    B.    The Board's two-Member majority conclusion that Troutbrook
          refused to discuss economic topics until all non-economic
          matters were resolved is not substantially supported by the
          record evidence...............................................................................24

          a.    Troutbrook engaged in lawful bargaining to attempt to
               negotiate a CBA that was appropriate for its needs and
               operations. .........................................................................28

          b.    The Union did not sufficiently test Troutbrook's
               willingness to engage in the give and take of collective
               bargaining...........................................................................40

CONCLUSION .................................................................................................43

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Life Sys. Inc. v. N.L.R.B.*,
  898 F.3d 38 (D.C. Cir. 2018)...............................................................23

*Atlanta Hilton & Tower*,
  271 NLRB 1600 (1984) ......................................................................27

*Audio Visual Services Group, Inc. d/b/a PSAV Presentation Services*,
  367 NLRB No. 103, slip op. (2019), affd. sub nom .....................26, 28

*Cal-Pacific Furniture*,
  228 NLRB 1337 (1977) .......................................................................24

*Captain's Table*,
  289 NLRB 22 (1988) ...........................................................................28

*Chevron Chemical Co.*,
  261 NLRB 44 (1982), enfd. 701 F.2d 172 (5th Cir. 1983)..................25

*Comau, Inc. v. N.L.R.B.*,
  671 F.3d 1232 (D.C. Cir. 2012)....................................................24, 43

*Consolidated Communications, Inc. v. N.L.R.B.*,
  837 F.3d 1 (D.C. Cir. 2016) ................................................................23

*DHL Express, Inc. v. N.L.R.B.*,
  813 F.3d 365 (D.C. Cir. 2016).......................................................24, 43

*District Hospital Partners, L.P. d/b/a The George Washington
  University Hospital*,
  379 NLRB No. 118 (2021) ................................ 26, 27, 28, 40, 41, 42

*Douglas Foods Corp. v. N.L.R.B.*,
  251 F.3d 1056 (D.C. Cir. 2001).........................................................24

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of
  Am. v. N.L.R.B.*,
  459 F.2d 1329 (D.C. Cir. 1972).........................................................23

ii

*John Wanamaker Philadelphia*,
   279 NLRB 1034 (1986) ................................................................25

*Kitsap Tenant Support Services, Inc.*,
   366 NLRB No. 98, slip op. (2018) ................................................26

*Long Island Jeep, Inc.*,
   231 NLRB 1361 (1977) ................................................................35

*N.L.R.B. v. Advanced Bus. Forms Corp.*,
   474 F.2d 457 (2d Cir. 1973) ........................................................36

*N.L.R.B. v. American National Insurance Co.*,
   343 U.S. 395 (1952).......................................................29, 30, 32, 39

*N.L.R.B. v. Katz*,
   369 U.S. 736 (1962)......................................................................24

*N.L.R.B. v. Montgomery Ward & Co.*,
   133 F.2d 676 (9th Cir.1943) ........................................................36

*Peoples Gas Sys., Inc. v. N.L.R.B.*,
   629 F.2d 35 (D.C. Cir. 1980)........................................................23

*Phillips 66*,
   369 NLRB No. 13, slip op. (2020) ...............................................27

*Pillowtex Corp.*,
   241 NLRB 40 (1979) enfd. 615 F.2d 917 (5th Cir. 1980)...........25, 35

*Pirlott v. N.L.R.B.*,
   522 F.3d 423 (D.C. Cir. 2008).................................................24, 43

*Public Service Co. of Oklahoma*,
   334 NLRB 487 (2001), enfd. 318 F.3d 1173 (10th Cir. 2003).....25, 26

*Wayneview Care Ctr. v. N.L.R.B.*,
   664 F.3d 341 (D.C. Cir. 2011).....................................................23

**Statutes**

29 U.S.C. § 151, 160(a) ..................................................................1

29 U.S.C. § 160(e) and (f)...............................................................1

iii

29 U.S.C. § 160(f) ...................................................................................23

NLRA Section 8(a)(1) and 8(a)(5) (29 U.S.C. § 158) ....................................19, 20

NLRA Section 8(d) (29 U.S.C. § 158) ...................................................26

NLRA Section 10(a) (29 U.S.C. § 160) ....................................................1

NLRA Section 10(j) (29 U.S.C. § 160) ................................................19

**Other Authorities**

New York Hotel Trades Counsel, *Benefits Overview*
    https://www.hotelfunds.org/benefits/ (last visited Sept. 14, 2021) .....................3

16333860.3

# GLOSSARY OF ABBREVIATIONS

National Labor Relations Board…………………………………NLRB or Board

National Labor Relations Act………….………..………………………..…NLRA

New York Hotel and Motel Trades Council, AFL-CIO………………………Union

Troutbrook Company LLC…………………………………..…Troutbrook or Hotel

Memorandum of Understanding……………………………………………MOU

Industry Wide Agreement…………………………………………………...IWA

## JURISDICTIONAL STATEMENT

The Board had jurisdiction under Section 10(a) of the National Labor Relations Act ("Act") as amended, 29 U.S.C. § 151, 160(a).  This Court has jurisdiction under Section 10(e) and (f) of the Act.  29 U.S.C. § 160(e) and (f).  The Board's Two-Member Majority Decision and Order was issued on December 16, 2022, and this petition for review was timely filed on February 1, 2023.

## STATEMENT OF ISSUES

1.     Whether the National Labor Relations Board ("NLRB" or "Board") erroneously found that Petitioner failed to bargain in good faith with New York Hotel and Motel Trades Council, AFL-CIO (the "Union") due to Petitioner's alleged refusal to discuss economic subjects of bargaining with the Union until all non-economic subjects were resolved.

2.     Whether the NLRB erroneously ordered an extension of the Union's certification year as an appropriate remedy.

## STATUTES AND REGULATIONS

The relevant statutory provisions of the Act are set forth in the Addendum to this brief.

16333860.3

1

## STATEMENT OF THE CASE

### A.     Troutbrook's Business and Operations

Troutbrook operates a small 60-room hotel in Brooklyn, New York.  (JA-49).[1]
While it carries the Marriott Fairfield name, it is an independently owned business
that has a license agreement with Marriott.  (*Id.*)  In 2018, following an NLRB re-
run election, the Union was certified to represent, at that time, approximately 30
front-desk, bell service, housekeeping, laundry, and food and beverage employees
at the Hotel.  (JA-66).  In issuing the certification, the Region had failed to address
the impact of the Union's threatening and harassing conduct leading up to the NLRB
election and so the Hotel challenged the Union's certification.  In February 2020,
the D.C. Circuit upheld the Union's certification as the bargaining representative.[2]
Shortly thereafter, however, the COVID-19 pandemic dramatically affected
New York and in particular the hotel and hospitality industry.  The initial effects of
the pandemic shutdown delayed the parties' negotiations for several months.

### B.     First Bargaining Session

Troutbrook and the Union participated in their first bargaining session on
May 18, 2020, once Covid-19 restrictions became manageable, to begin negotiating

---

[1] References to the hearing testimony on August 3, 2021 are hereinafter cited as
"Trs." followed by the page(s) referenced.

[2] There is no charge or allegation against Troutbrook that the objections relating to
the election were unlawful or evidence of bad-faith bargaining.  (JA-28).

2

an initial labor agreement for this small single bargaining unit.  (JA-13, JA-46; JA-82).  It was understood that this initial session was to be "introductory in nature", and to set the "foundation for the relationship" between Troutbrook and the Union. (JA-45–JA-46).

The Union presented its first, and only, offer which consisted of a 150+ page labor agreement, together with a 12-page supplement, known as a Memorandum of Understanding (the "Union's May 18 Proposal" or "IWA").  (JA-143–JA-299; JA-39; JA-327[3]).  This May 18 Proposal was the Union's standard, boilerplate agreement covering literally hundreds of terms of employment.  This was the "Industry Wide" labor agreement (known as the "IWA") that was in place for employees at the large Manhattan hotels that the Union represented.  It was supplemented by a Memorandum of Understanding that addressed dozens of additional employment terms and incorporated by reference the Union's health, pension, legal, and training funds, each with their own extensive trust and plan documents.  *See* The New York Hotel Trades Counsel, *Benefits Overview* https://www.hotelfunds.org/benefits/ (last visited Sept. 14, 2021).

---

[3] In its majority opinion, the Board mis-characterizes the IWA as being "tailored" to "[Troutbrook's operational needs]".  The Memorandum of Understanding ("MOU") sets forth 3 generic modifications to the IWA and otherwise incorporates the IWA and multiple contract riders by reference to dictate the terms of the parties' contract. *See* JA-143–JA-299; JA-83–JA-95.  The IWA alone has 74 articles and 17 attachments.  The Union's proposal cannot be truthfully described as "tailored" to an 8-person unit.

3

Due to the lengthy nature of the Union's proposal, Raymond Pascucci, Troutbrook's lead negotiator, informed Gideon Martin, the Union's representative, that he would need time to review the proposal with the Hotel. (JA-46; JA-82). Mr. Martin understood that at this time, it was not unreasonable for Troutbrook to not have any counter-proposals ready at this initial session, and that it would take some time for Troutbrook to review the entirety of the proposal. (JA-46). The Union noted its position in that meeting that it would be "happy" if Troutbrook signed onto its master contract "that covers hundreds of hotels", which established the position that the Union would firmly maintain throughout the course of negotiation. (JA-82).

## C.    Second Bargaining Session

The parties next met on June 4, 2020, where the Union demanded a response to its massive, comprehensive proposal it provided in the previous session. Mr. Pascucci opened the meeting by proposing some ground rules for the negotiations. (JA-96). One of those proposed rules was a proposition that the parties would first *focus* on non-economic issues of the contract, before turning to economic issues. (*Id.*) (emphasis added). Union General Counsel Rich Maroko pushed back, stating that the Union wanted to be able to talk about the entire agreement, and not limit discussions to particular topics. (*Id.*) Mr. Pascucci proceeded to clarify Troutbrook's position, in that Troutbrook was not willing to accept the IWA, whatsoever, due to the novelty of the Covid-19 pandemic and its impact on the hotel

4

industry, and that the IWA was not appropriate for a hotel of Troutbrook's size. (*Id.*) Rather, Troutbrook was simply seeking a "simple, streamlined contract to avoid disputes over interpretation." (*Id.*)

When Mr. Maroko inquired if Troutbrook was only pushing back on the economic provisions of the IWA, Mr. Pascucci stated that the Hotel was rejecting "all of [the IWA]" because "the language is way too convoluted and unnecessarily complex and burdensome" for this small bargaining unit. (JA-96–JA-97; *see* JA-327–JA-328[4]).

Upon learning that Troutbrook desired to negotiate a new, simple agreement for a hotel of its size, Mr. Maroko immediately reverted to profanity and argumentative tactics, chastising Troutbrook's position, stating that every employer "comes in and says to the Union, 'we're special.' I know your mom tells you that, but you're not special." (JA-97). Mr. Maroko made obvious the Union's negotiation position, which was that there was in essence to be no negotiation, when Mr. Pascucci asked if the IWA was a "one size fits all" agreement, and that Troutbrook "better get in line" to which Mr. Maroko replied "[y]eah, pretty much." (*Id.*) Mr. Maroko also stated later in the session, without any basis, that good faith

---

[4] While the Board references that Troutbrook "rejected the Union's proposal outright", it does not acknowledge the reasoning of Troutbrook's rationale for such rejection, as set forth above and as constantly reiterated by Troutbrook throughout the parties' bargaining sessions.

bargaining requires a "complete proposal" rejecting Mr. Pascucci's proposed approach of addressing segments of issues at a time.[5]  (JA-98).  Upon conclusion of this session, the parties agreed to exchange emails as to the proposed ground rules. (JA-98, JA-328[6]).

On June 4, 2020 Mr. Pascucci emailed the proposed ground rules to the Union. (JA-108-JA-109).  The Union objected to the rule stating, "the parties will focus on non-economic subjects before turning to economic subjects." (JA-107).  The Union responded that it did "not want to constrain the parties' capability to freely explore and discuss any items, such as specific proposals, terms, or conditions, during bargaining sessions."   (JA-107; JA-328).   This statement mischaracterized Troutbrook's proposed ground rule on its own terms and, what became evident in the second bargaining session, mischaracterized the Union's own intransigent negotiating stance since it insisted on an all-encompassing response to each and

---

[5] Throughout the entire course of negotiations, the Union maintained its baseless position that Troutbrook was legally obligated to provide a "complete counterproposal" in response to the IWA, and that Troutbrook's failure to do so constituted a failure to bargain in good faith.  (JA-124-JA-125; JA-132).  The record is clear that the Union's position stymied the negotiations.  (JA-114; JA-124-JA-125; JA-132).  While this was the principal issue advanced by the Union in its unfair labor practice charge, the General Counsel abandoned this claim after the August 3 hearing as confirmed by ALJ Esposito in her decision.  (JA-315, n. 4).

[6] The Board does acknowledge that Mr. Pascucci informed the Union that Troutbrook's response to the IWA "will not be the whole contract, just some of the articles in our contract and we'll state our counterproposal", to which Troutbrook did provide counterproposals to the Union at the next bargaining session, which will be subsequently discussed.

every one of its May 18 Proposal before negotiations could continue.  (JA-35, JA-39-JA-40).

In response to the Union's concerns, the Hotel proposed a modified ground rule:

> The Hotel's proposal that the parties will focus on non-economic subjects before turning to economic subjects *was not intended to preclude discussion about any and all issues at any point in time*; however, our proposal reflects a longstanding well-established tradition in labor relations as an orderly framework for achieving progress toward an overall collective bargaining agreement.  With this in mind, the Hotel now proposes the following modified ground rule:  "The parties agree to focus primarily on non-economic subjects before turning to economic subjects, *but it is understood that this general framework does not preclude either party from raising and freely discussing any item at any point in the bargaining process*."

(JA-105; JA-328) (emphasis added).

The Union's objection had been that it did not want a rule that constrained the parties' discussions because "successful bargaining requires an ability to discuss any aspect at any time." (JA-107).   The Hotel's modified rule gave the parties a framework and some direction, but specifically did not limit any discussion of any item at any time.  (*Id.*)  Nonetheless, the Union would not agree, and the Hotel did not press the proposed ground rule.  (JA-328[7]).

---

[7] The Board acknowledges that Mr. Pascucci informed the Union that Troutbrook would "move forward without the[] additional proposed ground rules".

7

### D.    Third Bargaining Session

The next bargaining session between the parties took place later that month.
Mr. Pascucci opened the session by describing the Hotel's current operations, and
that the Hotel was indeed affected by the pandemic as occupancy was down about
50%.  (JA-111).   The Hotel was recalling some employees, however, not all
employees wanted to return to work because of COVID-19 concerns.  (*Id*.)  During
the session, Mr. Pascucci provided the Union with several counterproposals, again
affirming that the Hotel rejected the May 18 proposal *in toto*, in favor of negotiating
its own, individualized CBA.   The proposals addressed union recognition, non-
discrimination, hours of work, overtime pay (an economic proposal), no-strike/no
lockout and probationary period.  (JA-113; JA-328, fn 6[8]).  The Hotel viewed these
topics as non-controversial and a good starting point to build momentum toward the
negotiation of a complete contract.  (JA-112; JA-300–JA-303).

When Mr. Martin inquired as to the length of contract that Troutbrook was
seeking, Mr. Pascucci responded that he was presently unsure about the desired
length of the contract, which would depend on economics, and the uncertainty as to

---

[8] The Board fails to acknowledge that Troutbrook's proposal regarding hours of
work also included terms that would govern overtime pay, specifically, that
"[o]vertime at the rate of time and one-half shall be paid for all hours worked in
excess of forty (40) hours per week" and that "[n]o employee shall receive overtime
pay unless such overtime work has been authorized or was performed with the actual
or constructive knowledge of the Hotel management."  (JA-120–JA-121).

16333860.3

how the next few years panned out, particularly given the Covid-19 pandemic.[9] (JA-113). Mr. Martin then again insisted that Troutbrook provide a "complete proposal" in response to the Union's May 18 proposal and, only after sending that full proposal could the parties "talk about specific topics." (JA-113–JA-114). Mr. Martin acknowledged, however, that the approach to bargaining that Mr. Pascucci articulated was reasonable. According to the Union's bargaining notes, in response to a statement from Mr. Pascucci about the Hotel's incremental method of bargaining, Mr. Martin explained "to be totally frank I don't do it that way. I know others do it that way *and are effective that way*." (JA-35; JA-114; *see* JA-328[10]) (emphasis added).

The parties began a substantive discussion on certain of the Hotel's counterproposals, including non-discrimination, overtime, and probationary status. (JA-115–JA-117). Notably, the parties specifically discussed proposed hours for full-time staff, and the particular conditions under which overtime wages would be paid. (JA-117–JA-118). However, the Union never followed up and never

_____

[9] Again, in its majority opinion the Board fails to acknowledge Mr. Pascucci's rationale here as to how Troutbrook's uncertain economic situation due to the Covid-19 pandemic was impacting its bargaining position and strategy. (*See* JA-328).

[10] The Board's characterization of Mr. Martin "urging . . . [Troutbrook] to consider providing a complete proposal…" is flatly contradicted by Mr. Martin's outright refusal to consider Mr. Pascucci's incremental bargaining approach, and the Union's repeated denials throughout bargaining that it would only accept a complete set of contract proposals in response to the IWA.

submitted any counterproposals to incorporate the concepts they discussed that day.

(*See generally* JA-122–JA-125, JA-129–JA-133, JA-134–JA-135, JA-136–JA-139,

JA-140–JA-142).

###   E.     Fourth Bargaining Session

Due to the resurgence of the Covid-19 pandemic, and its impact on the

New York City hospitality industry and Troutbrook's business, the next bargaining

session between the parties did not occur until February 2, 2021.  (JA-29; JA-328).

This was a mutually-agreed scheduling decision.  There is no contention that the

hiatus was caused by or evidenced bad faith on the part of Troutbrook, or that

Troutbrook refused to meet with the Union at any point during this period.  (JA-

313:6-8).

Mr. Pascucci began this session by providing an update of the Hotel's current

state of affairs, describing them as "still very bleak, low occupancy" and noting that

a substantial number of staff had quit or were laid off.  (JA-122).  Mr. Martin again

explained that the Union's position had not changed since the prior session, and that

it was demanding a complete set of contract proposals from the Hotel.  (JA-123; JA-

328–JA-329[11]).  Mr. Pascucci again expressed the Hotel's approach of working

---

[11] The Board's description that during the first three bargaining sessions, Troutbrook "adhered to its stated strategy of discussing non-economic subjects first", is a mischaracterization of the record.  Troutbrook advanced a limited set of non-controversial proposals from which to build a simple labor agreement.  The Board also fails to acknowledge that the Union adhered to its own, and unwavering position

cooperatively on simple, less adversarial, issues before moving to more complex topics. The Union acknowledged that the Hotel's approach was reasonable. Mr. Martin stated: "I understand different negotiators negotiate differently and you've been doing this much longer than I have. You prefer non-economic first, but that's not how I like to or accept doing it." (JA-124). Mr. Martin again "renew[ed] [the Union's] request for a complete proposal." (*Id*.)

In further explaining the Hotel's position, according to the Union's own notes, Mr. Pascucci said Troutbrook was "looking for language that is easy, simple, concise and a lot of flexibility and not restrictive that could get management in trouble when they are running a small hotel especially in today's conditions."[12] (JA-124). Mr.

---

that Troutbrook needed to provide a complete set of overall contract counterproposals to the IWA during these three sessions.

[12] To illustrate why bargaining off the IWA would have been counterintuitive here, below are the Union's proposals regarding overtime pay from the IWA, and Troutbrook's counterproposal to such.

Union's Overtime Proposal in the IWA at pages 9-10:
(1) Overtime at the rate of time and one-half shall be paid for all hours worked in excess of eight (8) hours per day or forty (40) hours per week in categories where the regular work week under this Agreement is forty (40) hours per week and for all hours worked in excess of seven (7) hours per day or thirty-five (35) hours per week.
(2) It is agreed that employees will work a reasonable amount of overtime and on the sixth (6th) day when requested to do so at the rates of pay set forth in this Agreement provided, however, that there shall be no scheduled overtime in any job classification if there are laid off employees in that job classification in the hotel and there shall be no scheduled extra room attendants if there are room attendants laid off in the hotel until available work in the job classification in the hotel has been offered to employees laid off in that job

11

classification, such offer to be made by reasonably available means of communication.

(3) The UNION and EMPLOYER agree that overtime pay shall be paid for all work performed on the sixth (6th) and seventh (7th) consecutive days of work unless such overtime work is occasioned by and Employer's business needs and further provided prior written notice of same is given and written consent is obtained from the UNION, which consent will not be reasonably withheld or delayed, unless emergency circumstances prevent the EMPLOYER from giving such notice to and obtaining consent from the UNION. In the event a dispute arises between the UNION and an EMPLOYER under the provisions of this Article 11(G)(3), the parties agree to proceed to expedited arbitration before the Office of the Impartial Chairperson. In no event, however, shall such expedited arbitration proceeding delay or prevent the performance of the work by the affected employee(s).

(4) Unless required by law, overtime shall not be paid where an employee or employees, subject to the written approval by the EMPLOYER, mutually agree in writing to change their schedule(s) or day(s) off under conditions which would otherwise result in overtime. This waiver shall also apply to any scheduling premiums or notice period under this Agreement if the change is mutually agreed upon pursuant to this provision.

(5) If one or more employee(s) refuse(s) to agree to the change in schedule or days off, and said change is nonetheless instituted by the EMPLOYER in accordance with the scheduling provisions of this Agreement, only the employee who did not agree to the change shall be paid overtime.

(6) No employee shall receive overtime pay unless such overtime work has been authorized or was performed with the actual or constructive knowledge of the EMPLOYER.

(7) Any employee who has heretofore been paid time and one-half after a shorter work day or shorter work week than specified under this Agreement shall constitute to receive overtime pay after such shorter work day or shorter work week as heretofore.

(8) If the UNION feels that an industry-wide condition of unemployment exists in any job classification covered by this Agreement and that an excessive amount of overtime in such job classification or, in the case of room attendants, an excessive amount of extra rooms has been scheduled in any hotel, the UNION may raise the matter as a grievance under Article 26 and, if the matter is not satisfactorily resolved, it shall be subject to arbitration thereunder. (JA-165–JA-166).

Union's MOU:

Martin again disregarded this explanation and argued that in response to multiple proposals by Troutbrook that he did not "know how to respond on such piece meal" proposals.  (*Id*.; *see* JA-329[13])  Mr. Pascucci called him on that position as "nonsense." (JA-125).  It is perfectly reasonable to tentatively agree on a recognition clause or a no strike/no lockout clause without having a full response on all of the topics covered in the Union's massive area standards agreement as proposed on May 18, 2020.  Mr. Pascucci left the door open but bluntly laid bare the Union's façade:

> [Pascucci]:  It is absolutely not persuasive.  I'm not saying we won't give you more, but the idea that we can't negotiate over these clauses is nonsense, you just don't want to.

(JA-125).

As Mr. Pascucci testified:

> Q: Did you ever indicate during bargaining that until an agreement was reached on those six items you would not move any further with respect to negotiating any mandatory subjects of bargaining?

_____

4. Breaks and Meal Periods: …Employees shall be paid overtime after eight (8) hours in one day, forty (40) hours in one week, or is *otherwise required by the IWA* (emphasis added).  (JA-83–JA-95).
Troutbrook Overtime Proposal:
5.4  Overtime at the rate of time and one-half shall be paid for all hours worked in excess of forty (40) hours per week.
5.5  No employee shall receive overtime pay unless such overtime work has been authorized or was performed with the actual or constructive knowledge of the Hotel management."  (JA-120–JA-121).
[13] The Board cites to Mr. Martin's statement that he was "willing to bargain . . . flexibility", but does not attempt to reconcile this statement with Mr. Martin's refusal to even consider negotiating with Troutbrook over the basic counterproposals it provided the Union.

13

A:  [Mr. Pascucci] Absolutely not.  In fact, I -- I said to Mr. Martin, you're the ones who are putting conditions on -- setting up roadblocks and putting conditions on bargaining, not the Employer, in these -- in this case.  All we've said is, here's -- here's some counters.  Let's get a response to those counters.  I told him that, you know, we -- we would go to another set, whether we settled these or not.  Let's get a response. We'll move on.  The Union just wouldn't respond to anything, and the Union's stance was, you're going to accept the -- the boilerplate -- the whole master agreement.  I explained, and I think Mr. Martin acknowledged some of this on cross-examination, that in my experience parties would often work through the easier issues first, get TAs [tentative agreements] on those, then move on to other issues that, in the end, oftentimes the biggest sticking points on the noneconomics side would still be open.  Then you'd get into the economics, and you'd start to make deals and trade things off, and that's how you build a -- in my experience, for what it's worth, that's how you do a first contract. That's how you build a contract.  You know, and I understand that the Hotel Trades Council would rather not do it that way because they have the master agreement, and they want everybody to accept the master agreement.

Q:  Did you ever -- did you ever indicate that you would refuse to negotiate economic items until all noneconomic items were completed?

A:  I did not.  In fact, what I was just saying was the opposite of that. It was that I acknowledged -- I recognized, and I -- I said I would expect that in the end we'll be wresting with economics alongside some of the remaining open noneconomic issues.

Q:  Did you ever receive any counterproposals to the six items that you submitted to the Union?

A:  Never.

(JA-50–JA-51)[14].

---

[14] Mr. Martin also acknowledged that Troutbrook never insisted on reaching an agreement as to all non-economic topics before it would discuss economic topics, as set forth below:

14

16333860.3

### F.    Fifth Bargaining Session

During the fifth session on March 11, 2021, Troutbrook again explained that economic conditions were difficult even with the Covid-19 vaccine rollout as the Hotel's occupancy was still low and rooms rates had decreased. (JA-302; JA-129). At this meeting, Troutbrook shared with the Union certain financial information regarding the Hotel's operations for 2021, including the number of employees working (now approximately 8 active employees), occupancy rates, and other employee retention practices. (JA-97, JA-130–JA-132).

Before allowing the parties to move into discussion on substantive bargaining, Mr. Martin again stated the Union's firm position that Troutbrook needed to "sign . . . onto the pattern contract" in order for negotiations to continue. (JA-132; *see* JA-329[15]).  Mr. Pascucci again stated Troutbrook's position that it rejected the area standards agreement in its entirety because it was designed for big hotels in Manhattan, and not a small hotel in Brooklyn. (*Id.*)  Mr. Martin then stated that the

---

Q: [Mr. Pascucci] Are you – are you testifying that the Employer ever said that we have to reach agreement on all economic items before we can move to economic items?
A: [Mr. Martin] *I don't believe you used the word all, no.*
(JA-32) (emphasis supplied).

[15] While not acknowledging this language from Mr. Martin, the Board effectively does acknowledge the position of the Union here, that "*if* (emphasis added) [Troutbrook] expressed a willingness to agree to the IWA with a MOU, he could 'come up with as many deals and breaks' as possible to arrive at an overall agreement."  This purported "flexibility" expressed by Mr. Martin was still contingent on Troutbrook agreeing to the massively complex IWA.

15

Union was waiting on Troutbrook's proposal, to which Mr. Pascucci stated that the Union was, and had been, in possession of Troutbrook's counterproposals, which the Union still continued to refuse to address until receiving a complete proposal. (*Id.*)  Mr. Martin then asserted, without any basis or citation, that the "Hotel is obligated according to the NLRA to give a complete proposal and after this many meetings and emails, it's not good faith bargaining to refuse economic proposal." (*Id.*; *see* JA-329)  Mr. Pascucci pointed out that good-faith bargaining goes both ways, and that Troutbrook had provided a set of proposals back in June of 2020, to which the Union was refusing to respond.  (*Id.*[16])  At no time during this session did the Union submit counterproposals to the issues on the table, or request discussion of any other specific terms of employment.  (JA-129–JA-133).

Following the fifth bargaining session, the parties exchanged a series of correspondence.  The Union articulated its position that the Hotel was obligated under the NLRA to provide a "complete contract proposal."  (JA-134–JA-135).  At the same time, the Union failed to provide any response to the individual counterproposals that the Hotel had presented.

The Hotel again explained its position in some detail:

At our most recent bargaining session, however, for the first time you claimed that BFF's [i.e. the Hotel, Brooklyn Fairfield] failure to present

---

[16] Throughout their opinion, the two Board Members in the majority here fail to recognize the Union's refusal to provide any response to Troutbrook's counterproposals.

16333860.3

a complete contract proposal on all subjects at the outset constituted bad faith bargaining. This prompted me to ask whether the Union was refusing to bargain with respect to the six counter proposals we have presented which you did not answer, or whether the Union was conditioning its willingness to negotiate over any of these contract articles on receipt of an entire contract proposal which you also did not answer.

I also stated that I was unaware of any Board law supporting the proposition that an employer must produce proposals on all bargaining subjects at the outset as you are now claiming, but that I was certainly open to considering any legal authority you may be aware of that supports your contention, and to advising my client accordingly. You responded by agreeing to send me case citations supporting your position.

Despite this, the letter you just sent contains no citations to any relevant cases, and instead simply reiterates HTC's demand that BFF acquiesce to your preferred style of bargaining.

Your letter is also factually inaccurate in asserting that BFF has flatly refused to even consider bargaining over any economic subjects until all non-economic subjects have been resolved. Rather, as you well know, I simply explained that in my experience having negotiated over 200 collective bargaining agreements, in the overwhelming majority of cases both parties mutually agree to focus on noneconomic subjects first, since this is seen as the most efficient way to get to an overall contract, and this has been especially true when negotiating initial contracts in my experience. As you also know, I further stated that in my experience, the parties typically do move on to economic subjects after many, but not all, of the non-economic issues have been worked out. This often occurs because once the parties have narrowed their differences to some key sticking points, then it may make sense to consider package deals that include both the remaining non-economic subjects along with economics subjects in an effort to reach an overall deal on the contract; and that when bargaining is carried out this way, each party is often compelled to re-evaluate its priorities and to make compromises in the final push for a contract that it was previously unwilling to make.

17

(JA-137–JA-138; *see* JA-329[17]).

In response to the dispute over a party's legal obligation to submit a complete contract offer, the Union filed the unfair labor practice charge underlying this proceeding.  (JA-64–JA-73, JA-136–JA-139).

### G.      Sixth Bargaining Session

Even given the filing of the unfair labor practice charge, the parties met a final time on April 21, 2021.  The Union had not changed its position in respect to providing a complete proposal since the last bargaining session, with Mr. Martin again asserting, without support, that the Union was entitled, as a matter of NLRB law, to a complete proposal of all mandatory bargaining topics.  (JA-142).  Mr. Pascucci noted that all of the unions he has dealt with up until this negotiation have been willing to discuss various topics without a complete set of proposals on every topic provided, and acknowledged that this dispute primarily boiled down to a difference in preference in negotiation style and in the legal obligations on this pivotal issue.  (*Id*.)  Otherwise in this session, the parties discussed the present day-to-day operations of the Hotel, and left the door open for future discussions regarding day-to-day operations pending the Board's decision of the difference in bargaining

---

[17] The Board's majority opinion states that "Pascucci . . . "*asserted* (emphasis added) that the Union was refusing to bargain regarding the six proposals [Troutbrook] had provided during the negotiations until [Troutbrook] provided a complete proposal." That the Union refused to bargain over the proposals that Troutbrook provided is not merely an assertion by Mr. Pascucci, but a fact clearly shown by the record evidence.

16333860.3

styles.  (JA-140–JA-142; JA-329).  The Union never requested another meeting to

resume contract negotiation on any subject, prior to the NLRB hearing.[18]  (JA-30).

### H.     NLRB Proceedings

On April 5, 2021, the Union filed an unfair labor practices charge against

Troutbrook alleging violations of Section 8(a)(1) and 8(a)(5) of the NLRA.  (JA-60–

JA-63).  Specifically, the Union alleged that during the course of negotiations,

Troutbrook a) refused to provide a comprehensive set of overall counterproposals;

b) restricted the noneconomic subjects over which it would bargain; and c) refused

to bargain about economic subjects until all noneconomic subjects of bargaining

were resolved.  (*Id.*)  On June 17, 2021, Kathy Drew King, Regional Director of the

National Labor Relations Board, Region 29, brought a complaint against Troutbrook

based on the Union's charge.  (JA-65).

---

[18] In parallel to this proceeding, the Board also filed a petition under NLRA Section
10(j), in the United States District Court for the Eastern District of New York on
October 20, 2021, seeking a preliminary injunction based upon the same legal
theories asserted in this action, and for an Order to compel Troutbrook to return to
the bargaining table.  On October 21, 2021, Honorable Judge LaShann DeArcy Hall
held a hearing on the 10(j) petition.  She reserved decision and urged the parties to
return to the bargaining table, particularly to address wages, health insurance and
retirement.  *See King v. Troutbrook Co., LLC*, 1:21-CV-04715 (E.D.N.Y. Mar. 31,
2022) (Dkt. #29).
On October 29, 2021, Troutbrook submitted its counterproposals on those three
terms of employment to the Union, and the parties resumed bargaining.

16333860.3

The matter was assigned to Administrative Law Judge Lauren Esposito (the "ALJ"), and a hearing was held on August 3, 2021, at which Mr. Pascucci and Mr. Martin testified in detail regarding the course of negotiations.  (*See generally* JA-6-JA-59).

On December 1, 2021, ALJ Esposito issued her decision in this matter, concluding that the Region had abandoned the claim that Troutbrook was legally obligated to provide an all-encompassing set of counterproposals on every topic, but also concluding that the Hotel violated Section 8(a)(1) and 8(a)(5) for allegedly refusing to bargain about economic subjects until all noneconomic subjects of bargaining were resolved, and for limiting the noneconomic subjects over which Troutbrook would bargain.  (JA-316, n. 5, JA-322: 22-27).

Troutbrook subsequently appealed ALJ Esposito's decision to the Board, excepting to several aspects of ALJ Esposito's decision, namely, the conclusion of ALJ Esposito that Troutbrook violated Section 8(a)(1) and 8(a)(5) of the Act for allegedly refusing to bargain about economic subjects until all noneconomic subjects of bargaining were resolved.

On December 16, 2022, the Board issued a decision upholding the findings of ALJ Esposito, specifically, that Troutbrook violated Section 8(a)(1) and 8(a)(5) of the Act for allegedly refusing to bargain about economic subjects until all noneconomic subjects of bargaining were resolved.  (See generally JA-327-JA-333).

20

Board Member Ring dissented, concluding that Troutbrook had acted in good faith and criticizing the majority for its failure to properly account for all the relevant circumstances, including the COVID pandemic, the Union's insistence on an all-encompassing response to the entirety of the IWA proposal, and the Union misguided legal theory and premature resort to the Board. (*See generally* JA-333-JA-342). Troutbrook submits this brief in support of its appeal of the Board's decision.

## SUMMARY OF ARGUMENT

The record evidence in this case demonstrates that from the onset of bargaining, both Troutbrook and the Union had very different desires they sought to achieve from bargaining – for Troutbrook, to negotiate a simple, streamlined agreement appropriate for its staff and operations – for the Union, to get Troutbrook to sign into its pattern contract that it used for hundreds of other hotels in the New York City metropolitan area. To attempt to achieve these goals, the parties took two different strategies.

To attempt to get Troutbrook to sign onto the IWA, or an agreement as close to the IWA as possible, the Union took, and stood firm by the position that Troutbrook was obliged to submit a complete counterproposal to the entirety of the IWA as an obligation of good faith bargaining, a position which is no longer being advanced in support of Troutbrook's alleged violation of the Act. To attempt to

16333860.3

negotiate a simple, custom agreement, Troutbrook took, and stood firm by the position that it intended to bargain on subsets of topics with the Union, attempt to reach agreements on those topics, and then move onto another set of proposals – an approach that has been tried and true by Mr. Pascucci in his longstanding history of negotiating initial collective bargaining agreements.

The record evidence does not show, however, that Troutbrook ever insisted on negotiating all non-economic topics before it would negotiate on economic topics, in violation of the Act, as the Board has concluded in this matter. Throughout bargaining, Troutbrook provided its rationale for this approach – that bargaining off of the IWA, which Troutbrook expressed at the outset of bargaining it did not desire to sign onto, would be counterproductive to bargaining a simple first agreement between Troutbrook and the Union, and that it desired to negotiate non-economic topics first, not only to build momentum in the bargaining process, but also due to the precarious economic position Troutbrook was in during the course of bargaining due to the Covid-19 pandemic.

Both Troutbrook and the Union had the right to stand firm in their respective bargaining positions. However, the Board's Decision here effectively concludes that while the Union was allowed to exercise its right to hold firm to its bargaining position, Troutbrook was not. This finding is not substantially supported by the totality of the record evidence, and this Court should overturn the Board's decision.

# STANDING

Troutbrook Company LLC, d/b/a Brooklyn 181 Hospitality LLC ("Troutbrook") is an employer within the meaning of Section 2(2) of the Act. 29 U.S.C § 152(2).   Under the Board's December 16, 2022 Decision and Order, Troutbrook is an "aggrieved" party within the meaning of Section 10(f) of the Act, 29 U.S.C. § 160(f), and as such has standing to seek review of Board's final order in this Court.

# ARGUMENT

## A.    Standard of Review.

This Court's "role in reviewing an NLRB decision is limited," (*Wayneview Care Ctr. v. N.L.R.B.*, 664 F.3d 341, 348 (D.C. Cir. 2011)), and the decision will be upheld provided it is not "arbitrary, capricious, or founded on an erroneous application of the law," and "its factual findings are supported by substantial evidence." *Advanced Life Sys. Inc. v. N.L.R.B.*, 898 F.3d 38, 43 (D.C. Cir. 2018); *see also Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. N.L.R.B.*, 459 F.2d 1329, 1346 (D.C. Cir. 1972) ("[A]dministrative agencies must act within the context of their own decisional law, must consider all the probative evidence put before them, and must give reasons for their decisions.").   However, this Court "does not function simply as the Board's enforcement arm." *Peoples Gas Sys., Inc. v. N.L.R.B.*, 629 F.2d 35, 42 (D.C. Cir. 1980); *see also Consolidated*

23

*Communications, Inc. v. N.L.R.B.*, 837 F.3d 1, 7 (D.C. Cir. 2016) ("[w]hile our review is deferential, we will not 'rubber-stamp' NLRB decisions,' and we 'examine carefully both the Board's findings and its reasoning.'") (internal citation omitted). Rather, this Court considers "not only the evidence supporting the Board's decision but also 'whatever in the record fairly detracts from its weight.'" *Douglas Foods Corp. v. N.L.R.B.*, 251 F.3d 1056, 1062 (D.C. Cir. 2001) (citation omitted).

With this, the Board has an obligation to "adequately explain its reasoning" for its decision (*DHL Express, Inc. v. N.L.R.B.*, 813 F.3d 365, 371 (D.C. Cir. 2016) (citations omitted)), and "cannot ignore its own relevant precedent but must explain why it is not controlling." *Comau, Inc. v. N.L.R.B.*, 671 F.3d 1232, 1236 (D.C. Cir. 2012) (citation omitted).  "Where an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious." *Pirlott v. N.L.R.B.*, 522 F.3d 423, 432 (D.C. Cir. 2008) (internal quotation marks and citation omitted).

**B.    The Board's two-Member majority conclusion that Troutbrook refused to discuss economic topics until all non-economic matters were resolved is not substantially supported by the record evidence.**

Troutbrook does not contest the well-established principle that a party's refusal to discuss a mandatory topic of bargaining may constitute a violation of Section 8(a)(5).  *See Cal-Pacific Furniture*, 228 NLRB 1337, 1341 (1977); *N.L.R.B. v. Katz*, 369 U.S. 736, 747 (1962).  When examining an alleged refusal to bargain,

24

the Board considers factors such as the motives and parties' states of mind, whether the parties have maintained an ongoing relationship, and whether other unfair labor practices are involved, among others. *Chevron Chemical Co.*, 261 NLRB 44, 45-47 (1982), enfd. 701 F.2d 172 (5th Cir. 1983). The Board examines these factors with an emphasis on the totality of the circumstances. *See Public Service Co. of Oklahoma*, 334 NLRB 487, 488-490 (2001), enfd. 318 F.3d 1173 (10th Cir. 2003)).

Troutbrook also does not contest that the Board has held that a party's insistence on resolving all non-economic bargaining topics before negotiating economic subjects can constitute a violation of Section 8(a)(5) and (1) if such a strategy "unreasonably fragment[s] the negotiations and drastically reduce[s] the parties' bargaining flexibility." *John Wanamaker Philadelphia*, 279 NLRB 1034, 1035 (1986); *see also Pillowtex Corp.*, 241 NLRB 40, 47, 49 (1979) enfd. 615 F.2d 917 (5th Cir. 1980).

However, Troutbrook does contest the Board's conclusion that Petitioner's bargaining strategy here amounted to an insistence on resolving all non-economic topics before discussing economics, or that such strategy either unreasonably fragmented the negotiations, or drastically reduced the parties' bargaining flexibility. While the Board has cited to certain portions of the record and conduct of the parties to support its conclusion, as NLRB Member Ring's dissenting opinion in this matter correctly points out, viewing the totality of the circumstances here, and

25

viewing the entire course of bargaining between the parties, shows that Troutbrook was engaging in lawful hard bargaining, but does not show that Petitioner ever insisted on resolving all economic issues first, and does not show that Petitioner's bargaining strategy fragmented the bargaining process.[19]

Section 8(d) of the NLRA requires parties engaged in collective bargaining "to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, . . . but such obligation does not compel either party to agree to a proposal or require the making of a concession." *District Hospital Partners, L.P. d/b/a The George Washington University Hospital*, 379 NLRB No. 118, at *6 (2021); citing 29 U.S.C. § 158(d).

When determining whether an employer has violated its statutory duty to bargain in good faith, the Board must ultimately determine, under the totality of the circumstances, "'whether the employer is engaging in hard but lawful bargaining to achieve a contract that it considers desirable or is unlawfully endeavoring to frustrate the possibility of arriving at any agreement.'" *Id*.; quoting *Kitsap Tenant Support Services, Inc.*, 366 NLRB No. 98 , slip op. at 8 (2018) (quoting *Public Service Co. of Oklahoma*, 334 NLRB 487, 487 (2001), enfd. 318 F.3d 1173 (10th Cir. 2003)); *see also Audio Visual Services Group, Inc. d/b/a PSAV Presentation Services*, 367

---

[19] The record is crystal clear that the bargaining broke down over the Union's erroneous insistence that NLRB law required Troutbrook to submit a comprehensive set of overall contract proposals.  (JA-98; JA-114; JA-124; JA-132).

26

NLRB No. 103, slip op. at 6-7 (2019) (finding that the parties engaged in lawful hard bargaining by holding firm to their positions because "neither party was required to give up its position or make concessions"), *affd. sub nom. International Alliance of Theatrical Stage Employees, Local 15 v. N.L.R.B.*, 957 F.3d 1006 (9th Cir. 2020).

As recently affirmed by the Board, a party has the right to "stand firm on a position if he reasonably believes that it is fair and proper or that he has sufficient bargaining strength to force the other part to agree." *District Hospital Partners, L.P.*, 379 NLRB No. 118 at *6; quoting *Atlanta Hilton & Tower*, 271 NLRB 1600 , 1603 (1984); *see also Phillips 66*, 369 NLRB No. 13, slip op. at 5 (2020) (finding that the parties engaged in hard but lawful bargaining as they stood firm on their respective core positions, while the employer also showed its willingness to adjust its proposals and reach agreement on other issues).  It is not for the Board to decide the good or bad faith of the parties based on the correctness or incorrectness of the reasons they put forward in support of their bargaining positions, otherwise, an employer would be at risk of violating Section 8(a)(5) of the Act whenever it based a bargaining proposal on a questionable assessment of its fiscal condition or competitive position in the marketplace. *Phillips 66*, 369 NLRB No. 13, slip op. at 8.

Further, the Board will not find that an employer failed to bargain in good faith if the union assumes that the employer's initial proposals reflect unalterable

27

positions without testing the employer's willingness to engage in the give and take of collective bargaining. *District Hospital Partners, L.P.*, 379 NLRB No. 118 at *6; *see also Audio Visual Services Group*, 367 NLRB No. 103 slip op. at *8 ("[W]e find that the [u]nion did not sufficiently test the [r]espondent's willingness to bargain prior to filing its bad-faith bargaining charge."); *Captain's Table*, 289 NLRB 22, 23 (1988) ("Nor do we find that when negotiations ended prematurely through the default of both parties . . . the [u]nion had sufficiently tested the [r]espondent's proposals to permit us to assess the latter's willingness to bargain in good faith.").

### a. Troutbrook engaged in lawful bargaining to attempt to negotiate a CBA that was appropriate for its needs and operations.

As aptly stated by Member Ring, this Court should frame its analysis as to whether Troutbrook violated the NLRA as follows. If Troutbrook's bargaining strategy was employed to avoid reaching an agreement, then it violated the Act. If Troutbrook's bargaining strategy was used to obtain a contract that it desired, then there can be no violation. (JA-341). The record evidence can only legitimately support the latter, as the record as a whole shows that Troutbrook's overall conduct demonstrated a sincere effort to reach an agreement on its terms – a standalone agreement not based on the IWA, as the Union repeatedly insisted on throughout bargaining, where such desired agreement would be more appropriate for Troutbrook's needs, particularly in the light of the Covid-19 pandemic, and the impact the pandemic was having on Troutbrook's operations.

28

In reaching its decision here, the Board failed to fully consider all of the facts of this particular case *(see NLRB v. American National Insurance Co.*, 343 U.S. 395, 410 (1952)), and the totality of the circumstances during the parties' bargaining sessions, particularly failing to account for the Union standing firm on its intent and only bargaining position to have Troutbrook sign onto the IWA and to repeatedly demand a complete set of contract proposals before discussing any specific topics, where the Union expressed such intent at the onset of negotiations, and held fast to that position throughout the entirety of negotiations.

The Board appears to argue that because Troutbrook did not allege that the Union's bargaining strategy here was in bad faith, or that Troutbrook did not file an unfair labor practice against the Union for its intended bargaining strategy, that the Union's bargaining position is not relevant.  (JA-331).  It is a fatal flaw in the Board's analysis to not take the Union's bargaining position into account here, as such position is entirely relevant and material when analyzing the totality of the parties' bargaining conduct.

The Union revealed its rigid bargaining objective during the second bargaining session between the parties, which it maintained throughout the entirety of negotiations, when it affirmed that the IWA presented to Troutbrook during the first bargaining session was a "one size fits all agreement," that Troutbrook had "better get in line" and sign the agreement.  (JA-97).  In response, Mr. Pascucci

29

clarified Troutbrook's position, that Troutbrook was not willing to accept the IWA, particularly due to the novelty of the Covid-19 pandemic and its impact on the hotel industry, and because the IWA was not appropriate for a hotel of Troutbrook's size. (JA-96). Mr. Pascucci further clarified Troutbrook's position and what it sought to achieve from negotiations, to negotiate a "simple, streamlined contract to avoid disputes over interpretation." *Id*. Also during this session, the Union deployed its bargaining strategy that Troutbrook was obligated to provide a "complete proposal" in response to all of the provisions of the IWA, rejecting Mr. Pascucci's proposed approach of addressing segments of issues at a time.[20] (JA-98).

At the next bargaining session, while reaffirming Troutbrook's position that it would not sign onto the IWA, Mr. Pascucci provided the Union with several proposals, which were selected due to Troutbrook's view that these proposals should be generally non-controversial, and would be a good starting point to build momentum in negotiating a new contract. (JA-112; JA-300–JA-303). In response, Mr. Martin again insisted that Troutbrook provide a "complete proposal" in response

---

[20] Troutbrook's proposed ground rule for negotiations succinctly summarizes its bargaining position, in that the parties "agree to focus primarily on non-economic subjects before turning to economic subjects, *but it is understood that this general framework does not preclude either party from raising and freely discussing any item at any point in the bargaining process*." (JA-101–JA-109) (emphasis added). While the Union did not accept, and Troutbrook did not further push this ground rule, this ground rule illustrates Troutbrook's willingness to discuss economic topics at any time, which it did in subsequent bargaining sessions.

30

to the IWA, and baselessly asserted that the Union could only "talk about specific topics" after receiving such a complete counterproposal. (JA-113–JA-114). Mr. Martin also acknowledged the validity of Mr. Pascucci's incremental bargaining approach, stating. "I know others do it that way and are effective that way." (JA-35; JA-114) (emphasis added). While the parties did substantively discuss some of Troutbrook's proposals during this session, the Union never followed up, or submitted any counterproposals to these proposals. It never tested the Company's willingness to bargain. (*See generally* JA-122–JA-125, JA-129–JA-133, JA-134–JA-135, JA-136–JA-139, JA-140–JA-142).

After acknowledging the "dark and devastating" impact of the pandemic on Troutbrook's operations, Mr. Martin again renewed the Union's demand for a "complete proposal". (JA-122-JA-123). Mr. Pascucci reiterated his preference to negotiate individual subjects before turning to core economics, and also provided rationale for this approach, as due to Troutbrook's precarious economic position at that time, any proposals regarding economics would be "very lean." (JA-123–JA-124). In response, Mr. Martin again recognized the validity of Mr. Pascucci's bargaining style, but also again rejected such approach, stating "that's not how I like to or accept doing it." (JA-124). Mr. Pascucci then pushed back on Mr. Martin's assertion that he could not respond to Troutbrook's "piece meal" counterproposals, and highlighted what the Union's intent was – for Troutbrook to "acquiesce to [the

31

Union's] way [of bargaining]".  (JA-124–JA-125).  Mr. Pascucci further affirmed that Troutbrook fully intended on providing a complete set of proposals for an overall contract to the Union, but it was just "a matter of when."  JA-125.

While during the bargaining session on February 2, 2021, Mr. Martin stated that the union could "bargain flexibility" and "should change the IWA for [Troutbrook's] operational needs" (JA-124), this purported "flexible" approach by the Union was proven to not be the Union's true approach during the fifth bargaining session on March 11, 2021, where Mr. Martin admitted that his desire was to "cut through a lot of this, [and] sign [Troutbrook] onto the pattern contract."  (JA-132). Mr. Pascucci responded by again affirming that Troutbrook had no desire to, and would not sign onto the IWA, as had been its position throughout the entire course of bargaining, and noted that in his experience negotiating first contracts, had never negotiated all economic and non-economic issues at the outset of bargaining, but rather bargained on subsets of issues, and then moved onto another subset.[21]  *Id*. Also during this session, Troutbrook's Director of Finance, Aida Tejada, pointed out to Mr. Martin how bargaining economics at this time was further complicated by a lack of communication from one of Troutbrook's lenders regarding another loan that Troutbrook was seeking, furthering Troutbrook's uncertain economic position.  *Id*.

---

[21] Notably, Mr. Pascucci did not distinguish between economics and non-economics when describing his approach of negotiating subsets of issues here.

The parties left this session with Mr. Pascucci requesting that Mr. Martin provide legal support for his assertion that the NLRA required Troutbrook to provide a "complete proposal" in response to the IWA. (JA-133).

After the fifth bargaining session, Mr. Martin emailed Mr. Pascucci, asserting that Troutbrook's failure to provide a complete counterproposal to the entirety of the IWA was "unreasonably fragment[ing] the negotiations and drastically reduc[ing] the bargaining flexibility of the parties." (JA-134–JA-135). Mr. Pascucci responded to Mr. Martin the same day, pointing out that Mr. Martin had said that he would provide NLRB authority for his assertion that Troutbrook was legally required to provide a complete set of counterproposals for an overall contract (where such authority still has not been provided)[22], reiterated the rationale for Troutbrook's bargaining approach, and that Troutbook at no point in negotiations had flatly refused to consider bargaining over economic subjects until all non-economic subjects had been resolved, and that it was the Union who had flatly refused to consider Troutbrook's opening set of counterproposals.[23]  (JA-136–JA-139).  In response to Mr. Pascucci's email, Mr. Martin responded by attempting to place the burden on Troutbrook to provide authority for its position that it did not need to

---

[22] Member Ring notes that there is no such authority.  (*See* JA-342).

[23] Nowhere in Mr. Pascucci's email was there any indication that Troutbrook did not plan on continuing bargaining with the Union in good faith, nor any sort of unilateral declaration as to how bargaining must proceed moving forward.

33

provide an all-encompassing set of counterproposals to the IWA, only stating that "[t]here are rich lines of NLRB jurisprudence" regarding Troutbrook's purported obligation to provide a full set of counterproposals to the IWA, and informed Mr. Pascucci that the Union was filing an unfair labor practice charge against Troutbrook, which is the subject of this proceeding.  (JA-64–JA-73, JA-136–JA-139).[24]

As set forth above, in reaching its decision, the Board's two-Member majority has simply misinterpreted what actually transpired during the parties' bargaining sessions, and in several cases, has outright mischaracterized the intent and actions of both Troutbrook and the Union.

First, a review of the record evidence here simply cannot lead to a conclusion that Troutbrook refused to discuss or bargain any economic subjects until all economic subjects were resolved.  Nowhere in the parties' bargaining notes, nor anywhere else in the record, is there any refusal by Troutbrook to discuss economics. In fact, Troutbrook repeatedly referred to its uncertain economic position as further

---

[24] Little was accomplished during the sixth bargaining session on April 21, 2021, where Mr. Martin again reinforced the Union's position that it was entitled to a complete set of counterproposals for an overall contract, with Mr. Pascucci expressing confusion as to why simple topics such as preamble and non-discrimination could not be addressed and resolved.  (JA-142).  The parties left this session agreeing to leave it to the Board to determine the lawfulness of Troutbrook's bargaining strategy.  *Id.*

support for the bargaining strategy that the Hotel was employing.  (*See* JA-300–JA-303; JA-129; JA-123)

There is a legally significant and meaningful difference between insisting that all non-economic subjects be resolved before addressing economics, and developing a new labor agreement by negotiating over a manageable set of proposals.  The former strategy is unlawful when it causes the negotiations to break-down, but has no support in this record.  The latter is a lawful strategy which the Union acknowledged can be "effective," and was clearly and properly deployed by Troutbrook here.

Merely deferring the discussion of economic issues to a later date (which is all Troutbrook did here) does not violate the NLRA so long as the deferral does not lead to undue delay.  *Long Island Jeep, Inc.*, 231 NLRB 1361, 1367 (1977) (finding no undue delay when the parties did not bargain over economic issues until the fifth meeting).  Further, Mr. Martin himself has acknowledged that Troutbrook never stated that the parties needed to reach agreement on all non-economic topics before turning to discussion of economic topics.[25][26]

---

[25] *See* fn 15, *supra*.

[26] In contrast, in *Pillowtex Co.*, one of the Board's cases cited in support of its decision, the employer's attorney explicitly stated that the union needed to agree to the employer's noneconomic package before the employer would move on to discuss economic issues.  241 NLRB 40, 43.

35

While Troutbrook refused to sign onto the IWA, or to provide an all-encompassing set of counterproposals to the IWA, it did so because Troutbrook intended to negotiate a simple, streamlined agreement.[27]  The Board's two-Member majority erroneously conflates this refusal to sign onto or negotiate based upon the terms of the IWA, with a refusal by Troutbrook to negotiate on any economic proposals.  (*See* JA-330) ("[Troutbrook] never provided any counterproposals on economic subjects.")  Significantly, while Mr. Martin repeatedly asserted during negotiations that the NLRA required Troutbrook to provide a full set of counterproposals to meet its obligation to bargain in good faith, the Region subsequently abandoned that theory in pursuing this charge.  (JA-315, n. 4).

Presumably, this theory has been abandoned because of the well-established principle that the process of bargaining is generally left to the discretion of the parties, so long as their conduct evidences a good faith effort to reach an agreement. *See N.L.R.B. v. Advanced Bus. Forms Corp.*, 474 F.2d 457, 467 (2d Cir. 1973) (noting that the employer's "sincere efforts in the contract negotiations" weighed against finding an unfair labor practice); *see also N.L.R.B. v. Montgomery Ward & Co.*, 133 F.2d 676, 686 (9th Cir.1943) (explaining that "it is the obligation of the parties to participate actively in the deliberations so as to indicate a present intention

---

[27] *See* fn 13, *supra*.

to find a basis for agreement, and a sincere effort must be made to reach a common ground.")

Regarding good-faith efforts, at the outset of negotiations, once the bargaining positions of each party were clearly established, Troutbrook at least tried to move negotiations forward by presenting a set of simple, non-controversial topics which should have been reasonably easy to resolve. Rather than credit Troutbrook for attempting to move negotiations forward, in its decision, the Board appears to actually fault Troutbrook for this, noting that Troutbrook "unilaterally chose" these topics, and appears to give credit to the Union for still reviewing and discussing these proposals during that bargaining session, noting that that the Union did so even though it had not received a comprehensive set of counterproposals to the entirety of the IWA from Troutbrook. (JA-330).

The Board fails to acknowledge that the Union refused to provide any counterproposals to Troutbrook's initial subset of topics, and fails to mention that the Union's only (baseless) excuse for not doing so, was that it could not respond to these topics without an all-encompassing response from Troutbrook regarding the IWA.[28] Even though Troutbrook made the only meaningful effort to actually

---

[28] To this point, the Board majority's assertion that "the record amply demonstrates that, apart from the IWA, the Union readily sought to bargain with [Troutbrook] over the limited topics that [Troutbrook] agreed to address" (see JA-331, fn. 9), is demonstrably false. While the parties did discuss these topics during one bargaining

negotiate contract terms, the Board's two majority Members still, by the nature of its decision, places all of the blame on Troutbrook for "fail[ing] to reach agreement on a single provision" after six bargaining sessions, over a course of 11 months. (JA-330).

The Board's majority also wrongly asserts that the Union did not present the IWA on a "take-it-or leave-it" approach[29], as described by dissenting Member Ring. (JA-331). To support this conclusion, the Board's majority refers to the MOU that the Union provided to Troutbrook "to accommodate [Troutbrook's] specific operational needs. (JA-331). There are several flaws with this theory. First, the riders included in the MOU "to accommodate [Troutbrook's] specific operational needs" were drafted exclusively by the Union as an initial proposal, without any input from Troutbrook. Second, notwithstanding the purported customization of the IWA as set forth by the MOU, that approach would not meet Troutbrook's legitimate objective for a simple concise agreement that would be easily understood and implemented. While the Board's majority points out, that the Union stated that it would be flexible "with respect to both economics and contract language" and that

---

session, the Union subsequently refused to provide any written responses to these proposals, or engage in further meaningful discussion regarding them.

[29] That the Board majority's findings are not supported by the record is clearly demonstrated by the Union's records from the second bargaining session in which the Union explicitly admitted that it was presenting the IWA to Troutbrook as a "one size fits all" approach. (JA-97).

it "stood ready to discuss changes proposed by [Troutbrook]" (JA-331), these statements were predicated on Troutbrook's accepting the IWA (with modifications)[30] – a result that was unacceptable to Troutbrook.

As explained by Member Ring, there is no legal precedent which would support the finding that Troutbrook was obligated to provide a full set of counterproposals to the IWA at any time during the course of the parties' bargaining. (JA-342).  The record evidence clearly shows, this was the only thing that Troutbrook refused to do during bargaining – it did not, as the Board's two-Member majority erroneously concludes – refuse to bargain over economic topics until all non-economic topics were resolved.

In their decision, the two Board Members in the majority have effectively sided with the Union's bargaining strategy, and substantive bargaining position, over Troutbrook's, in violation of Congressional labor policy prohibiting the Board from directly or indirectly compelling concessions or otherwise sitting in judgment on the substantive terms of collective-bargaining agreements.  *See N.L.R.B. v. American National Insurance Co.*, 343 U.S. 395, 401-404 (1952).  The Board majority's

---

[30] Mr. Martin's statement during the fifth bargaining session that his goal was to "sign [Troutbrook] onto the pattern contract." (JA-132) is reflected in the Board majority's opinion which notes that "if [Troutbrook] [would] agree to the IWA with a MOU", he would then bargain flexibility.  (*See* JA-329); (*see also* JA-113–JA-114; JA-123).

39

decision effectively holds that the Union was allowed to "stand firm" in its bargaining position, but Troutbrook was not allowed to exercise that same right. For these reasons, this Court should reverse the finding of the Board's two-Member majority that Troutbrook negotiated in bad faith.

### b. The Union did not sufficiently test Troutbrook's willingness to engage in the give and take of collective bargaining.

As stated *supra*, the Board will not find that an employer failed to bargain in good faith if the union assumes that the employer's initial proposals reflect unalterable positions without testing the employer's willingness to engage in the give and take of collective bargaining. *District Hospital Partners, L.P.*, 379 NLRB No. 118 at *6 (further citations omitted).

In *District Hospital Partners, L.P.*, the majority Board opinion held that the union did not sufficiently test the employer's willingness to bargain in good faith, even where the union filed the unfair labor practice charge approximately a year and a half after the parties' first bargaining session. 379 NLRB No. 118 at *9. The majority also highlighted that based on its conduct in negotiations, the union seemed to have decided early on that the employer had no interest in reaching an agreement, with the union stating such, just two weeks into collective bargaining. *Id.* ("Perhaps the Union decided that its best chance of prevailing lay in Board litigation rather than at the negotiating table.")

The *District Hospital* majority also pointed out that the employer made clear at the onset of negotiations that it intended to bargain for a contract that moved away from the expired CBA between the union and the employer, and further noted that rather than seriously attempting to reach an agreement by substantively engaging with the employer's proposals, the union chose to be intransigent and belligerent, repeatedly uttering profane and offensive comments. *Id*. Finally, the majority highlighted that the employer's initial proposals did not evince an intent to frustrate the reaching of an agreement when they were not presented as final offers. *Id*. at *10.

The facts and holding of *District Hospital Partners, L.P.*[31] largely mirror the facts (and what should be the holding) here, as to whether the Union sufficiently tested Troutbrook's willingness to bargain. Here, in even less time than in *District Hospital Partners, L.P.*, the Union filed an unfair labor practice charge against Troutbrook after only five bargaining sessions, and less than a year's time spent in the bargaining process (when accounting for the COVID hiatus).

Further, when Mr. Martin referenced his desire to sign Troutbrook onto the pattern contract, stating "something tells me that's not what you're interested in,"

---

[31] The *District Hospital* majority overturned the findings of the ALJ in that matter, and held that the employer did not fail to bargain in good faith in violation of Section 8(a)(5) and (1) of the Act, specifically, that it did not engage in surface bargaining during the parties' negotiations.

Mr. Pascucci replied "[w]e've told you exactly what we're interested in.  It's not the pattern contract, we want a contract that reflects this business – a small hotel in Brooklyn, etcetera."  (JA-132).   Finally, when the Union initially learned of Troutbrook's desire to negotiate its own contract rather than sign onto the IWA, the Union's general counsel responded with a series of mocking and profanity-laced comments, such as "[e]veryone comes in and says to the Union, 'we're special.'  I know your mom tells you that, but you're not special", and "I don't need to bullshit, I don't need to posture.  You can go through the motions and that's fine."  (JA-97–JA-98).

This conduct from the Union demonstrates that the Union, from the outset of negotiations, never took Troutbrook's desire to negotiate a simple, streamline agreement seriously, and rather than actually engage with Troutbrook to attempt to meaningfully negotiate any proposals, decided to take its chances with litigation based on the faulty legal premise that a full set of counterproposals on all topics was required, to attempt to force Troutbrook to engage with its desired bargaining approach and strategy.  The Union never attempted any other bargaining strategy with Troutbrook.   As such, the Union did not adequately test Troutbrook's willingness to engage in the give and take of collective bargaining, and the Board's majority decision should also be reversed on this ground.

42

Further, notwithstanding the factual similarities between *District Hospital Partners, L.P.*, decided only approximately two years ago, and this matter, the two Board Members in the majority here have failed to explain their rationale for reaching a different conclusion here than the Board did in *District Hospital Partners, L.P.* As the Board majority has failed to adequately explain its reasoning for ignoring its own relevant precedent, and has departed from that established precedent without a reasoned explanation, this Court should vacate the Board's decision as arbitrary and capricious. *See DHL Express, Inc.*, 813 F.3d at 371; *Comau, Inc.*, 671 F.3d at 1236; *Pirlott*, 522 F.3d at 432, *supra*.

## CONCLUSION

Based on the foregoing, Troutbrook respectfully requests that this Court grant Troutbrook's Petition for Review and set aside and vacate the Board's Decision and Order, reported at 372 NLRB No. 26, and deny the NLRB's cross-application for enforcement.

Dated: August 9, 2023                     BOND, SCHOENECK & KING, PLLC


                                          By:   */s/Thomas G. Eron*
                                                Raymond J. Pascucci, Esq.
                                                Thomas G. Eron, Esq.
                                          *Attorneys for Petitioner*
                                          600 Third Avenue
                                          New York, New York 10016
                                          Telephone: (646) 253-2300

16333860.3

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. ("Rule") 32(a)(7)(B) because it contains 10,915 words, excluding the parts of the brief exempted by Rule 32(f).  I further certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in 14-point Times New Roman font, a proportionally spaced typeface.

Dated:  August 9, 2023                    BOND, SCHOENECK & KING, PLLC


                                          By:   /s/*Thomas G. Eron*
                                                Thomas G. Eron, Esq.

44

16333860.3

# ADDENDUM

# TABLE OF CONTENTS TO ADDENDUM

29 U.S.C. § 151……………………………………………………….ADD1

29 U.S.C. § 158(a)(1), (a)(3), (d)……………………………………..ADD3

29 U.S.C. § 160(a), (e), (f), (j)……………………………………..ADD5

16333860.3

**29 U.S.C. § 151**

**§ 151. Findings and declaration of policy**

The denial by some employers of the right of employees to organize and the refusal by some employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, which have the intent or the necessary effect of burdening or obstructing commerce by (a) impairing the efficiency, safety, or operation of the instrumentalities of commerce; (b) occurring in the current of commerce; (c) materially affecting, restraining, or controlling the flow of raw materials or manufactured or processed goods from or into the channels of commerce, or the prices of such materials or goods in commerce; or (d) causing diminution of employment and wages in such volume as substantially to impair or disrupt the market for goods flowing from or into the channels of commerce.

The inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association substantially burdens and affects the flow of commerce, and tends to aggravate recurrent business depressions, by depressing wage rates and the purchasing power of wage earners in industry and by preventing the stabilization of competitive wage rates and working conditions within and between industries.

Experience has proved that protection by law of the right of employees to organize and bargain collectively safeguards commerce from injury, impairment, or interruption, and promotes the flow of commerce by removing certain recognized sources of industrial strife and unrest, by encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions, and by restoring equality of bargaining power between employers and employees.

Experience has further demonstrated that certain practices by some labor organizations, their officers, and members have the intent or the necessary effect of burdening or obstructing commerce by preventing the free flow of goods in such commerce through strikes and other forms of industrial unrest or through concerted activities which impair the interest of the public in the free flow of such commerce. The elimination of such practices is a necessary condition to the assurance of the rights herein guaranteed.

It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.

16333860.3

**29 U.S.C. § 158(a)(1), (a)(3), (d)**

**§ 158. Unfair labor practices**

**(a)Unfair labor practices by employer**

It shall be an unfair labor practice for an employer—

(1)to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

\*\*\*

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

**(d) Obligation to bargain collectively**

For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: Provided, That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later:

The duties imposed upon employers, employees, and labor organizations by paragraphs (2) to (4) of this subsection shall become inapplicable upon an intervening certification of the Board, under which the labor organization or individual, which is a party to the contract, has been superseded as or ceased to be the representative of the employees subject to the provisions of section 159(a) of this title, and the duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract.  Any employee who engages in a strike within any notice period specified in this subsection, or who engages in any strike within the appropriate period specified in subsection (g) of this section, shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 158, 159, and 160 of this title, but such loss of status for such employee shall terminate if and when he is reemployed by such employer.  Whenever the collective bargaining involves employees of a health care institution, the provisions of this subsection shall be modified as follows:

(A) The notice of paragraph (1) of this subsection shall be ninety days; the notice of paragraph (3) of this subsection shall be sixty days; and the contract period of paragraph (4) of this subsection shall be ninety days.

(B) Where the bargaining is for an initial agreement following certification or recognition, at least thirty days' notice of the existence of a dispute shall be given by the labor organization to the agencies set forth in paragraph (3) of this subsection.

(C) After notice is given to the Federal Mediation and Conciliation Service under either clause (A) or (B) of this sentence, the Service shall promptly communicate with the parties and use its best efforts, by mediation and conciliation, to bring them to agreement.  The parties shall participate fully and promptly in such meetings as may be undertaken by the Service for the purpose of aiding in a settlement of the dispute.

16333860.3

# 29 U.S.C. § 160(a), (e), (f), (j)

## § 160. Prevention of unfair labor practices

### (a)Powers of Board generally

The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce.  This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise: Provided, That the Board is empowered by agreement with any agency of any State or Territory to cede to such agency jurisdiction over any cases in any industry (other than mining, manufacturing, communications, and transportation except where predominantly local in character) even though such cases may involve labor disputes affecting commerce, unless the provision of the State or Territorial statute applicable to the determination of such cases by such agency is inconsistent with the corresponding provision of this subchapter or has received a construction inconsistent therewith.

\*\*\*

### (e) Petition to court for enforcement of order; proceedings; review of judgment

The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceedings, as provided in section 2112 of title 28. Upon the filing of such petition, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board.  No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.  The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive.  If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional

ADD-5

evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record. The Board may modify its findings as to the facts, or make new findings by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive, and shall file its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review by the appropriate United States court of appeals if application was made to the district court as hereinabove provided, and by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of title 28.

**(f) Review of final order of Board on petition to court**

Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112 of title 28. Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e), and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.

\*\*\*

**(j) Injunctions**

The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair

labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order.  Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

16333860.3